**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 679-9006
E-mail: swestcot@bursor.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN RAMIREZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LASIKMD USA INC. d/b/a LASIK MD VISION<br><br>Defendant. | Case No.  **'24CV2221 MMADDL**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Juan Ramirez ("Plaintiff") brings this class action complaint on behalf of himself, and all others similarly situated (the "Class Members"), against Defendant LasikMD USA Inc. d/b/a Lasik MD Vision ("Defendant" or "LasikMD"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.     This is a class action suit brought on behalf of all patients who visited us.lasikmd.com (the "Website") to book consultations for laser vision correction procedures.[1]

2.     LasikMD is one of the largest providers of Laser-Assisted In Situ Keratomileusis ("LASIK") in the United States, with its surgeons performing "over 2 million procedures in North America."[2]  Such procedures are performed to treat a variety of health conditions affecting vision, including Myopia, Hyperopia, and Astigmatism.[3]

3.     When booking medical services online, patient privacy is crucial. Patients expect, as they should, that their information will be held in confidence and not shared with third parties without their knowledge or consent.

4.     Moreover, information concerning an individual's healthcare, including medical procedures, is protected by state and federal law.  Despite these protections and Defendant's duty as a healthcare provider, Defendant aided, employed, agreed,

---

[1] Defendant offers a variety of laser vision procedures including PresbyVision, photorephractive keratectomy (PRK) surgery, wavefront-optimized lasik, contoura lasik, and all-laser lasik procedures.  *Vision Correction Procedures*, LASIK MD VISION, (last visited July 29, 2024), https://www.lasikmd.com/procedures/laser-procedures.

[2] https://www.lasikmd.com/

[3] https://www.lasikmd.com/candidacy/are-you-a-candidate

1

and conspired with Facebook[4] to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## THE PARTIES

5.    Plaintiff Juan Ramirez is, and has been at all relevant times, an adult citizen of California who resides in San Diego, California.  During the time Plaintiff used Defendant's Website, he maintained an active Facebook account.

6.    While in California, in June 2024, Plaintiff booked a consultation for LASIK surgery through Defendant's Website.  Unbeknownst to Plaintiff, Defendant assisted third parties with intercepting sensitive information pertaining to his LASIK surgery consultation.

7.    Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiff's communications, including those that contained individually identifiable health information. Defendant assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. As a consequence, Plaintiff has received targeted advertisements on Facebook.

8.    By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Ramirez's personally identifiable information and protected health information.

9.    Defendant LasikMD is a North American provider for corrective laser vision surgery.  Defendant is incorporated in Delaware, with its headquarters in

---

[4] In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Facebook."

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Montreal, Canada.  Defendant LasikMD develops, owns, and operates the Website, which is used throughout North America, including California.

10.     Defendant maintains a clinic in San Diego at 8881 Fletcher Parkway, Suite 395, CA 91942.  Patients can schedule appointments through Defendant's Website for medical procedures, including LASIK surgery, for its California clinic location.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

12.     This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a citizen of California, and submits to the jurisdiction of the Court.  Further, Defendant has at all times relevant hereto, systematically and continually conducted business in California, including within this District, and/or intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its services to residents within this District and throughout California by maintaining a clinic in San Diego. Additionally, Plaintiff, while in California, scheduled a LASIK surgery consultation at Defendant's California location using Defendant's Website.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

## **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**A.    Defendant's Website**

14.    Defendant offers LASIK surgery to its patients at its medical facilities located throughout the United States, including California.  The Website, us.lasikmd.com/, offers patients online access to its services, including bookings for consultations with surgeons for its LASIK procedures.

15.    At all relevant times, Defendant's Website hosted code for the Facebook Tracking Pixel.

16.    The Facebook Tracking Pixel Defendant has embedded in its Website recorded Plaintiff's and Class Members' interactions and transmitted the information to Facebook, as discussed *infra*.

**B.    Facebook's Platform and its Business Tools**

17.    Facebook describes itself as a "real identity platform,"[5] meaning users are allowed only one account and must share "the name they go by in everyday life."[6]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[7]

---

[5] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[6] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[7] FACEBOOK, SIGN UP, https://www.facebook.com.

4

18.    In 2023, Facebook generated over $134 billion in revenue.[8] With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[9]

19.    Facebook sells advertising space by highlighting its ability to target users.[10] Facebook can target users so effectively because it surveils user activity both on and off its site.[11] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[12] Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[13]

20.    Advertisers can also build "Custom Audiences."[14] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[15] With Custom Audiences, advertisers can target existing

---

[8] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS; INITIATES QUARTERLY DIVIDEND, https://s21.q4cdn.com/399680738/files/doc_financials/2023/q4/Meta-12-31-2023-Exhibit-99-1-FINAL.pdf, at 1.

[9] *Id.* at 10.

[10] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[11] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[12] FACEBOOK, AUDIENCE AD TARGETING: HOW TO FIND PEOPLE MOST LIKELY TO RESPOND TO YOUR AD, https://www.facebook.com/business/ads/ad-targeting.

[13] FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[14] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=246909795337649.

[15] FACEBOOK, AUDIENCE AD TARGETING: HOW TO FIND PEOPLE MOST LIKELY TO RESPOND TO YOUR AD, https://www.facebook.com/business/ads/ad-targeting.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[16] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Facebook's "Business Tools."[17]

21.    As Facebook puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[18] Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

22.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[19] Facebook's Business Tools can also track other events. Facebook offers

---

[16] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[17] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[18] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[19] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[20] Advertisers can even create their own tracking parameters by building a "custom event."[21]

23.    One such Business Tool is the Facebook Tracking Pixel. Facebook offers this piece of code to advertisers, like Defendant, to integrate into their website. As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[22] When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers. This second secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

24.    An example illustrates the point. Take an individual who, at relevant times, navigated to Defendant's Website, and, as Plaintiff did, requested a consultation by clicking the "Free Consultation Book Now!" or the "Book Your

---

BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[20] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142

[21] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; see also FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[22] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Free Consult" buttons.  When clicked, the individual's browser sent a GET request to Defendant's server requesting that server to load the particular webpage. As a result of Defendant's use of the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening. Facebook then secretly duplicates the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribed regarding communication's content and the individual's identity.

25.    As shown in Figure 1, such information includes that a patient is booking a pre-operation, in-clinic consultation at one of LasikMD's medical facilities.

**Figure 1:**

26.    After collecting and intercepting the information described in the preceding paragraph, Facebook processed it, analyzed it, and assimilated it into datasets like Core Audiences and Custom Audiences.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**C.    How Defendant Disclosed Plaintiff's and Class Members' Protected Health Information and Assisted with Intercepting Communications**

27.    Using the Facebook Tracking Pixel, Defendant shared patients' online activity, including their sensitive and confidential information related to appointments for LASIK procedures.

28.    For example, as alleged above, when a patient entered the Website and requested a consultation, Defendant transmitted information relating to the specific patient's consultation to Facebook via the Facebook Tracking Pixel.

29.    Each time Defendant sent this activity data, it also disclosed customers' personally identifiable information, including their Facebook ID. A Facebook ID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique Facebook ID, so too can any ordinary person who comes into possession of a Facebook ID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the Facebook ID can connect to any Facebook profile.

30.    A user who accessed the Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

31.    When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32.    One such cookie was the "fr cookie" which contained, at least, an encrypted Facebook ID and browser identifier.[23]  Facebook, at a minimum, used the fr cookie to identify users.[24]

33.    If a visitor had never created an account, an even smaller set of cookies was transmitted.

34.    At each stage, Defendant also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[25]

35.    The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[26] Otherwise, the c_user cookie is cleared when the browser exits.[27]

36.    The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[28] If that happens, the time resets, and another 90 days begins to accrue.[29]

---

[23] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[24] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[25] Id.

[26] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[27] Id.

[28] See id.

[29] Confirmable through developer tools.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    37.    The _fbp cookie expires after 90 days unless the visitor's browser

2    accesses the same website.[30] If that happens, the time resets, and another 90 days

3    begins to accrue.[31]

4    38.    The Facebook Tracking Pixel used both first- and third-party cookies.

5    A first-party cookie is "created by the website the user is visiting"—*i.e.*,

6    Defendant's Website.[32] A third-party cookie is "created by a website with a domain

7    name other than the one the user is currently visiting"—*i.e.*, www.facebook.com.[33]

8    The _fbp cookie was always transmitted as a first-party cookie. A duplicate _fbp

9    cookie was sometimes sent as a third-party cookie, depending on whether the

10    browser had recently logged into Facebook.

11    39.    Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link

12    to Facebook IDs and corresponding Facebook profiles. Defendant sent these

13    identifiers alongside the event data.

**D.    Plaintiff Never Provided Defendant or Facebook with Consent to Intercept His Sensitive and Confidential Personally Identifiable Information**

16    40.    Plaintiff never consented, agreed, authorized, or otherwise permitted

17    Defendant to disclose his confidential and sensitive personally identifiable

18    information. Plaintiff was never provided with any written notice that Defendant

19    disclosed the users of its Website nor was he provided with any means of opting out

---

[30] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[31] Also confirmable through developer tools.

[32] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[33] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

of such disclosures. Defendant nonetheless knowingly disclosed to Facebook his sensitive and confidential personally identifiable information.

41. Facebook likewise never received consent to intercept sensitive, protected information. In fact, Facebook expressly warrants the opposite, promising to shield that information from disclosure.

42. When first signing up, a Facebook user assents to three agreements: the Terms of Service,[34] the Cookies Policy,[35] and the Data Policy.[36]

43. Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[37] The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[38]

44. Facebook's Data Policy recognizes that there may be "[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."[39] The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[40] Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[41]

---

[34] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[35] FACEBOOK, COOKIES POLICY, https://www.facebook.com/policies/cookies/.

[36] FACEBOOK, DATA POLICY, https://m.facebook.com/about/privacy/update/printable.

[37] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[38] *Id.*

[39] FACEBOOK, DATA POLICY, https://m.facebook.com/about/privacy/update/printable.

[40] *Id.*

[41] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

45.     Facebook then offers an express representation: "**We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us**."[42] Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[43]

46.     Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[44]

47.     Facebook's other representations further reinforce these warranties. In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45] And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[46] Facebook does not "want websites or apps sending us sensitive information about people."[47] Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[48]

48.     These representations are repeated frequently. Facebook created a "Help Center" to better explain its practices to users. In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook

---

[42] *Id.* (Emphasis added).

[43] *Id.*

[44] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[45] FACEBOOK, INTRODUCTION TO ADVERTISING STANDARDS, https://www.facebook.com/policies/ads/.

[46] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565

[47] *Id.*

[48] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[49] In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[50]

49.     Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

**E.    Warning on Tracking Codes on Health Care Websites**

50.     The federal government has issued guidance warning that tracking code, like the Facebook Tracking Pixel, may violate federal privacy law when installed on healthcare websites such as Defendant's. The statement titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022.[51]

51.     Healthcare organizations regulated under the Health Insurance Portability and Accountability Act ("HIPAA") may use third-party tracking tools, such as the Facebook Tracking Pixel, in a limited way, to perform analysis on data

---

[49] FACEBOOK, HOW META RECEIVES INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[50] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870650830?ref=dp.

[51] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (Mar. 18, 2024).

14

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[52]

52. The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI***. Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[53]

53. Plaintiff and Class Members face the risks about which the government expresses concern. Defendant disclosed the fact that Plaintiff's and Class Members' booked LASIK surgery consultations on Defendant's Website, which in turn also discloses the health conditions for which they seek a health care provider; the

---

[52] *Id.* (Emphasis added).

[53] *Id.* (Emphasis added).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

frequency with which they take steps relating to their vision; and where they seek medical treatment.  This information is, as described by the OCR in its bulletin, "highly sensitive."

54.    The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code*.[54]

55.    Crucially, that paragraph in the government's Bulletin continues:

> *All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, *when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care*.[55]

56.    Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies

---

[54] *Id*. (Emphasis added).

[55] *Id*. (Emphasis added).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

. . . Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could

constitute a breach of security under the FTC's Health Breach Notification Rule . . . .[56]

57.    Therefore, Defendant's conduct is directly contrary to clear pronouncements by the FTC and HHS.

58.    In light of, and in addition to, the federal government's own issued guidance above, news sources also warn that tracking code, like the Facebook Tracking Pixel, poses risks of violating federal privacy law and HIPAA: Federal regulators are warning [regulated entities] hospital systems and telehealth providers about the data privacy risks of using third-party tracking technologies.

These services, like [Facebook Tracking] Pixel or Google Analytics, could violate the Health Insurance Portability and Accountability Act (HIPAA) or Federal Trade Commission (FTC) data security rules, officials said.

The FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 [regulated entities] hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps … "The compliance buck still stops with you. Furthermore, your company is legally responsible even if you don't use the data obtained through tracking technologies for marketing purposes."[57]

59.    Fierce Healthcare also spoke up in an April 3, 2023 article:

Nearly all nonfederal acute care hospitals' [regulated entities'] websites track and transfer data to a third party, potentially fueling the unwanted

---

[56] FEDERAL TRADE COMMISSION, FTC AND HHS WARN HOSPITAL SYSTEMS AND TELEHEALTH PROVIDERS ABOUT PRIVACY AND SECURITY RISKS FROM ONLINE TRACKING TECHNOLOGIES, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

[57] Heather Landi, *Regulators warn hospitals and telehealth companies about privacy risks of Meta, Google tracking tech*, FIERCE HEALTHCARE, July 21, 2023, https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

disclosures of patients' sensitive health information and opening up that [regulated entity] hospital to legal liability, according to a recently published University of Pennsylvania analysis. [https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2022.01205]. The census of more than 3,700 hospital [regulated entity] homepages found at least one third-party data transfer among 98.6% of the websites as well as at least one third-party cookie on 94.3%, researchers wrote in Health Affairs.

60.    Health Affairs also published an article in April 2023, stating:

The hospitals' [regulated entities'] homepages had a median of 16 third-party transfers, more of which were found among medium-sized (100 to 499 beds) hospitals, nonprofit hospitals, urban hospitals, health system-affiliated hospitals and those that weren't serving the largest portion of patients in poverty, they wrote … Many of these complaints cite Facebook parent company Meta's Pixel tracker, which a June 2022 investigation from The Markup [https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites] detected on about a third of large hospitals' websites. That report found evidence that, in some instances, the sensitive data transferred to third parties met the criteria for a HIPAA violation.[58]

By including third-party tracking code on their websites, hospitals [regulated entities] are facilitating the profiling of their patients by third parties. These practices can lead to dignitary harms, which occur when third parties gain access to sensitive health information that a person would not wish to share. These practices may also lead to increased health-related advertising that targets patients, as well as to legal liability for hospitals [regulated entities].[59]

---

[58] Dave Muoio, *Almost every hospital's homepage is sending visitors' data to third parties, study finds*, FIERCE HEALTHCARE, Apr. 3, 2023, https://www.fiercehealthcare.com/providers/almost-every-hospital-homepage-sending-visitors-data-third-parties-study-finds.

[59] Ari B. Friedman, et al., *Widespread Third-Party Tracking On Hospital Websites Poses Privacy Risks For Patients And Legal Liability For Hospitals*, HEALTH AFFAIRS, Vol. 42, No. 24, Apr. 2023, https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.01205.

19

61.    This is further evidence that the data that Defendant chose to share is protected PII and PHI.  The sharing of that information was a violation of Class Members' rights.

## CLASS ACTION ALLEGATIONS

62.    Class Definition: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have a Facebook account and scheduled a consultation for LASIK surgery on Defendant's Website (the "Class").

63.    Plaintiff also seeks to represent a subclass of individuals defined as all persons in California who have a Facebook account and scheduled a consultation for LASIK surgery on Defendant's Website (the "California Subclass").

64.    Excluded from the Classes are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

65.    **Numerosity** (Fed. R. Civ. P. 23(a)(1)): Members of the Classes are so numerous that joinder of all members is impractical.  Although Plaintiff does not yet know the exact size of the Classes, based on information and belief, the Classes include at least tens of thousands of members.

66.    **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2), 23(b)(3)): There are numerous questions of law and fact common to the Classes which predominate over any individual actions or issues, including but not limited to:

(a)    Whether Defendant gave the Class Members a reasonable expectation of privacy that their communications were not being intercepted, received,

or collected by Facebook when they inputted sensitive information through Defendant's Website;

(b)   Whether Defendant in fact assisted, conspired with, or otherwise aided Facebook with intercepting, receiving, or collecting communications from Class Members when Class Members communicated sensitive information;

(c)   Whether Defendant's assistance with intercepting, receiving, or collecting communications between Defendant and Class Members violated the law;

(d)   Whether Defendant's assistance with intercepting, receiving, or collecting communications between LasikMD and Class Members violated the California Information Privacy Act;

(e)   Whether Plaintiff and Class Members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

(f)   Whether Plaintiff and Class Members have sustained damages as a result of Defendant's conduct and if so, what is the appropriate measure of damages or restitution.

67.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, booked a consultation for LASIK surgery on Defendant's Website and had his sensitive information collected and disclosed by Defendant without consent.

68.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the ECPA and the CIPA. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the

Classes. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

69.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. Even if every member of the Classes could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiff anticipates no difficulty in the management of this action as a class action.

## <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>
### Violation of the Electronic Communications Privacy Act,
### 18 U.S.C. § 2511(1)

70.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

71.     The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

72.     The ECPA protects both sending and the receipt of communications.

73.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

74.     The transmission of Plaintiff's private and confidential information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

75.     The transmission of the private and confidential information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

76.     The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

77.     The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

78.     The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

79. The following instruments constitute "devices" within the meaning of the ECPA:

    a. The computer codes and programs Facebook used to track Plaintiff and Class Members communications while they were navigating the Website;

    b. Plaintiff's and Class Members' browsers;

    c. Plaintiff's and Class Members' mobile devices;

    d. Defendant and Facebook's web and ad servers;

    e. The plan Defendant and Facebook carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

80. Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

81. By utilizing and embedding the Facebook Tracking Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

82. Specifically, Defendant assisted Facebook in intercepting Plaintiff's and Class Members' electronic communications through the Facebook Tracking Pixel, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' private and confidential information to third parties, such as Facebook.

83. Defendant assisted in the interception of communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding private and confidential information, including their Facebook ID and treatment information. This confidential information was then monetized for targeted advertising purposes.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

84.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

85.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

86.    Defendant intentionally intercepted or intentionally assisted in the interception of the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

87.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3).  This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to

which there is a reasonable basis to believe that the information can be used to identify the individual.[60]

88.    Plaintiff's information that Defendant assisted Facebook in intercepting qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6.  Defendant used the wire or electronic communications to increase its profit margins.  Defendant specifically used the Facebook Tracking Pixel to track and utilize Plaintiff's and Class Members' private and confidential information for financial gain.

89.    Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

90.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the Facebook Tracking Pixel.  Plaintiff and Class Members had a reasonable expectation that Defendant would not intercept or assist in the interception of their private and confidential information without their knowledge or consent.

91.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

92.    As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

## COUNT II
### Violation of the California Invasion of Privacy Act,
### California Penal Code § 631

93.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

---

[60] 42 U.S.C. § 1320d-6.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

94.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  The Act begins with its statement of purpose.

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

95.     A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . .

Cal. Penal Code §631(a).

96.     Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

97.     To avoid liability under § 631(a), a defendant must show it had the consent of all parties to a communication.

98.     At all relevant times, Defendant aided, agreed with, and conspired with Facebook to track and intercept Plaintiff's and Class Members' internet communications while accessing Defendant's Website. These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

99.     Defendant, when aiding and assisting Facebook's wiretapping and eavesdropping, intended to help Defendant learn some meaning of the content in

27

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff and Class Members interaction with the Website, including information relating to the booking of their consultation for LASIK surgery, a medical procedure.

100.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the tracking technology falls under the broad catch-all category of "any other manner":

(a)   The computer codes and programs the third parties, such as Facebook, used to track Plaintiff's and the Class Members' communications while they were navigating Defendant's Website;

(b)   Plaintiff's and Class Member's browsers;

(c)   Plaintiff's and Class Members' computing and mobile devices;

(d)   The third parties' web and ad servers;

(e)   The web and ad-servers from which Facebook tracked and intercepted the Plaintiff's and Class Members' communications while they were using a web browser to access or navigate Defendant's Website;

(f)   The computer codes and programs used by the third parties, such as Facebook, to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website; and

(g)   The plan Facebook carried out to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit Defendant's Website.

101.    The information that Defendant transmitted using the Facebook Tracking Pixel constituted sensitive and confidential personally identifiable information.

102.    As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties, like Facebook, to receive its patients' sensitive and

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

confidential online communications through Defendant's Website without their consent.

103.    As a result of the above violations, Defendant is liable to Plaintiff and other members of the California Subclass in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT III
### Invasion of Privacy Under California's Constitution

104.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

105.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

106.    At all relevant times, by using Facebook's tracking pixel and computer code to record and communicate consumers' sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

107.    Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and health information

29

would remain confidential, and that Defendant would not install wiretaps on its Website.

108.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive and confidential online communications.

109.    This invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and confidential online communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right because Plaintiff and Class Members did not anticipate disclosure of their LASIK surgery consultations to third parties such as Facebook.

110.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff representative of the Classes and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)    For compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    (e)  For punitive damages, as warranted, in an amount to be determined at
2         trial;
3    (f)  For prejudgment interest on all amounts awarded;
4    (g)  For injunctive relief ordering Defendant to immediately cease its illegal
5         conduct;
6    (h)  For an order awarding Plaintiff and the Class Members their reasonable
7         attorneys' fees and expenses and costs of suit; and
8    (i)  For an order granting Plaintiff and the Class Members such further relief
9         as the Court deems appropriate.

10                              **JURY DEMAND**

11   Plaintiff on behalf of himself and the proposed Classes, demands a trial by
12   jury on all claims so triable in this action.

13

14   Dated: November 26, 2024            Respectfully submitted,

15                                       **BURSOR & FISHER, P.A.**

16                                       By: _____*/s/ Sarah N. Westcot*_____
17                                             Sarah N. Westcot

18                                       Sarah N. Westcot (State Bar No. 264916)
                                         701 Brickell Ave., Suite 2100
19                                       Miami, FL 33131
                                         Telephone: (305) 330-5512
20                                       Facsimile:  (305) 679-9006
                                         E-mail: swestcot@bursor.com
21

22                                       *Attorney for Plaintiff*

23

24

25

26

27

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED